IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CASE NO. 3:23-CR-151-FDW-DCK

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| | ) | MEMORANDUM AND |
| Plaintiff, | ) | RECOMMENDATION |
| | ) | |
| v. | ) | |
| | ) | |
| SHAMEL MALIK DOVE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**THIS MATTER IS BEFORE THE COURT** on Defendant's "Motion To Suppress And Memorandum In Support" (Document No. 25). This motion has been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b) and is ripe for disposition. Having carefully considered the briefs, testimony, and oral arguments, the undersigned will respectfully recommend that the motion be <u>denied</u>.

## I. PROCEDURAL HISTORY

On June 21, 2023, Defendant Shamel Malik Dove ("Defendant" or "Dove") was indicted for: (1) possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1); (2) possession with intent to distribute fentanyl in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B); and (3) possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(i). (Document No. 1). Defendant, through counsel, filed a "Motion To Suppress And Memorandum In Support" (Document No. 25) on May 21, 2024, seeking to suppress certain Government evidence in the case. The "Government's Response To Defendant's Motion To Suppress" (Document No. 29) was filed on May 28, 2024. "Defendant's Reply To Government's Response to Defendant's Motion To Suppress" (Document No. 34) was filed June 12, 2024.

The undersigned held a hearing on the "Motion To Suppress..." on June 27, 2024.

The principal questions before the Court are whether Defendant has standing to move to suppress evidence recovered from the search of the vehicle in which he was a recent passenger, and if so, whether the search of the vehicle was lawful.

## II. FACTUAL SUMMARY

As noted, the Court conducted a hearing in this matter on June 27, 2024, at which the Government and Defendant each presented witness testimony and argument. The Government presented the testimony of one law enforcement officer—Detective Trey Hinton ("Hinton") of the Charlotte-Mecklenburg Police Department ("CMPD"). Defendant presented the testimony of two law enforcement officers—Detectives J.D. Cameron ("Cameron") and William Wallace ("Wallace") of CMPD; Defendant also presented the testimony of Shaquille Steele ("Steele"). Evidence also included cross-examination of the witnesses, presentation of body-worn camera footage from each of the officers, presentation of a satellite image of the area of the search, presentation of an Instagram photo posted by one of the witnesses, and police reports and narratives written by the aforementioned officers.

First, the Government presented the testimony of Detective Trey Hinton. Detective Hinton has been employed with CMPD since about 2018 and has been a detective in the North Tryon Division since 2022. Detective Hinton works with Operation SCARLET (Stolen Car and Recovery Law Enforcement Team), and the May 2023 arrest of Defendant was part of Detective Hinton's work with Operation SCARLET. Prior to Operation SCARLET, Detective Hinton worked on Operation 4140 for about two years, which specialized in the investigation of narcotics, guns, drugs, and human trafficking in the Sugar Creek area of Charlotte. During his work with Operation 4140, Detective Hinton performed undercover work purchasing illegal narcotics and

2

firearms. Detective Hinton estimated that, over the course of his career, he has encountered firearms several hundred times.

The Government asked Detective Hinton about Defendant's arrest on May 8, 2023. Detective Hinton recalled that sometime that day, Detective Cameron informed Detective Hinton that Defendant had an indictment, and as part of his work with Operation SCARLET, Detective Cameron had also obtained a record for a stolen vehicle relating to Defendant. Detective Cameron informed Detective Hinton that he had located an individual who was posting on social media with Defendant. Detective Hinton, along with other detectives, then traveled to that location and identified Defendant sitting on the patio of a restaurant with the man from the social media post, later identified as Steele, and a woman, later identified as Shi'dae Sellers ("Sellers"). Detectives learned that Sellers had an unrelated order for arrest and placed Defendant and Sellers under arrest on the patio of the restaurant. Detective Hinton testified that, at the time of the arrests, the Ford Explorer in which Defendant, Steele, and Sellers had arrived was parked across the street from the restaurant. Detective Hinton is not aware of any contact between Defendant and the Ford Explorer, other than when Defendant exited the parked vehicle to walk across the street to the restaurant.

When officers arrested Defendant, he attempted to flee, and officers, including Detective Hinton, took Defendant to the ground. Based on Detective Hinton's training and experience, he believed Defendant was concealing contraband in his pants. Detectives searched Defendant's pants and removed a firearm that was concealed in Defendant's underwear.

Based on the firearm recovered from Defendant's person, Detective Hinton testified that he believed there existed probable cause to search the Ford Explorer. Detective Hinton testified that based on his training and experience, when a firearm is recovered during an arrest, it is common for the arrestee to have ammunition, additional firearms, magazines, and other firearm-

3

related items in their vehicle or in any place they have just come from. Detective Hinton has made numerous arrests of people who possessed firearms on their persons and had just exited a vehicle; Detective Hinton estimated that in about sixty percent of these instances, additional contraband is found inside of the vehicle. Detective Hinton testified that even if he had not believed officers had probable cause to search the Ford Explorer, he still would have looked into the windows of the vehicle from the outside.

The Government then asked Detective Hinton about the search of the Ford Explorer. At some point that day, detectives discovered Sellers to be the registered owner of the Ford Explorer. Upon placing her under arrest, law enforcement obtained the keys to the Ford Explorer and traveled across the street to search the vehicle. Detective Hinton testified that at the time of the search, the Ford Explorer was parked in a public surface lot, the search occurred during the daytime, the lot had no gate, there were other cars and pedestrians in the vicinity, and the lot was surrounded by open businesses. The lot was roughly one hundred yards from the restaurant.

Detective Hinton and Detective Wallace were both present for the search of the Ford Explorer. As Detective Wallace approached the driver's side of the vehicle to put on his gloves, Detective Hinton began to look though the passenger-side windows. Detective Hinton observed what appeared to be a clear plastic bag containing blue pills in the back seat on the passenger's side and announced to Detective Wallace that he saw oxycodone pills in the back seat. Detective Hinton made this observation through the window of the closed passenger-side doors, and, upon making the observation, pressed his body-worn camera to the window of the vehicle to capture his view of the back seat. Detective Hinton testified that Exhibit 4, a screengrab of his body-worn camera footage, fairly and accurately represents what Detective Hinton saw when he looked through the window of the Ford Explorer.

4

When Detective Hinton observed the pills, Detective Wallace had potentially already opened the driver's door, but Detective Hinton testified that no other doors had been opened, and no one, including Detective Wallace, had entered or touched anything in the back seat of the vehicle. Based on his training and experience, Detective Hinton believed the bag of pills to be blue oxycodone pills. Detective Hinton further testified that he had seen pills that appeared similar to those he saw in the back of the Ford Explorer hundreds of times and had purchased such pills many times during his undercover experience. Because the pills readily appeared to Detective Hinton to be illegal contraband, Detective Hinton testified that, upon seeing the pills though the window, he would have searched the Ford Explorer, even if Detective Wallace had not opened the driver's-side door.

On cross-examination of Detective Hinton, Defendant's counsel inquired about Detective Hinton's knowledge about Operation SCARLET's investigation into Defendant and his knowledge about Defendant's associates. Detective Hinton recalled that Detective Cameron had observed Defendant with Steele in an Instagram post and recalled Steele being present on the restaurant patio where Defendant was arrested. Detective Hinton was unable to answer Defendant's counsel's questions about Steele and Sellers because he was not the lead detective on Defendant's case. Detective Hinton recalled hearing from Detective Wallace that Sellers was the driver of the Ford Explorer on May 8, 2023, when the vehicle was parked across the street from the restaurant where Defendant was eventually arrested.

Defendant's counsel presented Exhibit 12, which Detective Hinton identified as Detective Cameron's police report. Defendant's counsel noted that the report approximated the time of Defendant's arrest as 3:52 p.m.

5

Defendant's counsel then inquired about the search of the Ford Explorer and the keys to the vehicle. Detective Hinton did not remember which officer found the keys but did recall that they were recovered from Sellers. Detective Hinton further testified that because he believed there was probable cause to search the vehicle, officers would have broken the window to search the Ford Explorer if they had not located the keys. Defendant's counsel presented Exhibit 11, which is Detective Wallace's body-worn camera footage from the search of the Ford Explorer. From the body-worn camera footage, Detective Hinton identified himself announcing that he saw the pills to Detective Wallace and testified that he made this announcement at about the same time that Detective Wallace opened the front door to the Ford Explorer. Detective Hinton further testified that he may have made the announcement a few seconds after he actually saw the pills. The parking lot was one hundred yards from the patio where Defendant was arrested, and Defendant and Sellers were both under arrest and not near the vehicle at the time of the search.

The Defendant then presented the testimony of Detective J.D. Cameron. Detective Cameron has worked as part of Operation SCARLET since April 2023. Detective Cameron testified that during the course of his investigation into Defendant, he learned that Defendant associated with Shaquille Steele and was arrested with Steele in February of 2023. On May 8, 2023, Defendant was present on the patio with Steele and Sellers to celebrate Steele's birthday. Detective Cameron also learned that day that Steele and Sellers had a romantic relationship with each other. Defendant's counsel then presented Exhibit 14, an Instagram post depicting two men whom Detective Cameron identified as Defendant and Steele.

While attempting to locate Defendant, Detective Cameron took a screenshot of the Instagram post and asked Sergeant Jaco Vargas, the supervisor for Operation SCARLET, to track the location of Steele, whom Detective Cameron knew to be on electronic monitoring. While

Sergeant Vargas was tracking the location of Steele, Detective Cameron went to the state magistrate's office around 3:00 p.m. to obtain a warrant for Defendant's arrest for possession of a stolen motor vehicle. Detective Cameron, who was in a marked police vehicle, waited on a side street near the restaurant until the time of the arrest. While in his vehicle, he heard other officers announcing that the occupants of the Ford Explorer were seen on the patio of the restaurant. Just before the arrest, Detective Cameron drove to the patio of the restaurant and noted that the occupants of the Ford Explorer all appeared calm on the patio, and no officers had seen any of the people on the patio commit any crimes that day. Detective Cameron estimated that roughly twenty minutes elapsed between the time Defendant was seen on the patio by other Detectives and the time he was arrested.

When Detectives made the arrest of Defendant, Detective Cameron placed Sellers under arrest because she had an order for arrest for a misdemeanor. Detectives identified Sellers when Detective Wallace, while surveilling Defendant, relayed the license plate number of the Ford Explorer through the radio, and Detectives discovered that the vehicle was registered to Sellers and that she had an order for arrest. Detective Cameron did not recall, specifically, the basis for Sellers' order for arrest but did recall that it had nothing to do with the Ford Explorer. Upon arresting Sellers, Detective Cameron testified that he performed a search incident to arrest and an inventory search of her purse. During the search of the purse, Detective Cameron found the keys to the Ford Explorer. Detective Cameron completed the search of Sellers' purse, and took her keys to his police vehicle, before eventually handing them off to another detective who used the keys to search the Ford Explorer. Sellers did not consent to the search of her purse, did not consent to Detective Cameron's taking her keys, and did not consent to the search of the Ford Explorer.

7

Case 3:23-cr-00151-FDW-DCK    Document 40    Filed 07/15/24    Page 7 of 18

Detective Cameron estimated about twenty minutes elapsed between the time Defendant exited the Ford Explorer and the arrests of Defendant and Sellers.

Defendant's counsel then inquired about the identity of the fourth individual who had arrived in the Ford Explorer, along with Defendant, Steele, and Sellers. Defendant's counsel presented Exhibit 11, body-worn camera footage from Detective Wallace, and from that footage, Detective Cameron identified the fourth individual sitting on the patio during the arrest as the fourth individual that Detective Wallace observed exiting the Ford Explorer. Detective Cameron did not speak to or obtain any information from this fourth individual, explaining that, at that point, officers had no reason to detain him.

On cross-examination of Detective Cameron, the Government inquired about the search of Sellers' purse. Detective Cameron testified that the purse did not belong to Defendant, and nothing found inside of the purse connected the purse to Defendant. Detective Cameron further testified that he has never seen Defendant in the Ford Explorer.

Defendant next presented the testimony of Detective William Wallace, a Detective with CMPD assigned to Operation SCARLET. Detective Wallace has been employed by CMPD since August 2018. Defendant's counsel inquired about how Detective Wallace initially located Defendant. Detective Wallace testified that on the afternoon of May 8, Sergeant Vargas advised Detective Wallace that Steele's electronic monitoring device was reporting Steele's location as 1713 Scott Avenue, in a parking lot. Detective Wallace traveled to the parking lot where Steele's location was reported, and observed a silver SUV, with its doors open and four individuals beginning to exit the vehicle; Detective Wallace observed that a woman exited the driver's seat of the vehicle, Steele was seated in the front passenger's seat of the vehicle, and the fourth individual exited the back seat of the vehicle on the driver's side. Detective Wallace noted that

8

Case 3:23-cr-00151-FDW-DCK    Document 40    Filed 07/15/24    Page 8 of 18

two of the men exiting the vehicle appeared to be Defendant and Steele, based on the Instagram photo Detective Wallace had seen. Detective Wallace then parked his vehicle in the lot, positioned to observe the four occupants exit the vehicle. From his new vantage point, Detective Wallace saw all four individuals walk away from the Ford Explorer, across Scott Avenue, and towards the restaurant. Detective Wallace did not observe any suspicious behavior from the four individuals as they exited the Ford Explorer and walked towards the restaurant, where Detective Wallace lost sight of them. Detective Wallace remained in his vehicle until other officers radioed that they were prepared to apprehend Defendant, and Detective Wallace walked across the street to the patio of the restaurant.

As Detective Wallace approached the patio, Defendant ran into him. Defendant's counsel presented Exhibit 11, Detective Wallace's body-worn camera footage, and from that footage Detective Wallace identified 3:53 p.m. as the time stamp at the time Defendant ran into Detective Wallace, during the arrest. As Detective Hinton was placing Defendant under arrest, Detective Hinton asked Detective Wallace to assist. Detective Wallace then removed a concealed firearm from Defendant's underwear. Detective Wallace testified that, based on his training and experience, individuals who illegally possess firearms often have additional contraband concealed elsewhere. Detective Wallace further noted that Defendant's felon status might incentivize him to store any contraband he may possess in a location not on his person. Based on the firearm recovered from Defendant, Detective Wallace's training and experience, and the totality of the circumstances, Detective Wallace believed there was probable cause to search the Ford Explorer. Detective Wallace estimated fifteen to twenty minutes elapsed between the time he observed Defendant exit the Ford Explorer and the time Defendant was arrested.

On cross-examination, the Government inquired about Defendant's connection to the Ford Explorer. Detective Wallace testified that Defendant was not driving the Ford Explorer, that Defendant was not the registered owner of the Ford Explorer, that prior to seeing Defendant exit the Ford Explorer on May 8, Detective Wallace had never seen Defendant in the Ford Explorer before, and that during the search of the vehicle, Detective Wallace did not find any documentation connecting Defendant to the vehicle. Detective Wallace further testified that the vehicle was not stopped by police, but had been parked and voluntarily left in a public parking lot, during the daytime, with pedestrian traffic in the area, before the occupants walked to the restaurant. Defendant was not inside the Ford Explorer when it was searched.

The Government then inquired about the search of the Ford Explorer. Detective Wallace testified that when Detective Hinton announced that he saw the pills in the backseat, Detective Wallace had not yet moved into the backseat area of the vehicle.

Defendant next presented the testimony of Shaquille Steele.[1] Defendant's counsel inquired about Steele's relationship to Sellers. Steele testified that prior to his incarceration, he lived with Sellers for several years, and she is the mother of his four children. Steele further testified that Sellers drives a silver Ford Explorer, but that she only infrequently drives Steele in that vehicle, and she rarely, if ever, drives Steele to meet with friends in that vehicle.

Defendant's counsel then inquired about the events of May 8, 2023. Steele testified that on that day, he invited Defendant to celebrate Steele's birthday with Steele, Sellers and a fourth individual. Steele testified that he, Defendant, Sellers, and the fourth individual went inside the restaurant to order drinks and food before moving to the patio. During the arrest that occurred on the patio, Sellers was also arrested. Steele testified that Sellers was arrested for a failure to appear,

---

[1] Steele was in custody and was accompanied by his appointed lawyer from a recent state criminal case. Steele asserted his Fifth Amendment Rights as to some questions on direct examination, but not others.

10

which was unrelated to the Ford Explorer. After answering some questions by Defendant's counsel, Steele asserted his Fifth Amendment rights and declined to answer further questions.

Steele was not cross-examined by the Government.[2]

### III. STANDARDS OF REVIEW

The Constitution's Fourth Amendment protects individuals from unreasonable searches and seizures. The text of the Fourth Amendment "signals that . . . it confers 'a personal right that must be invoked by an individual.'" United States v. Smith, 21 F.4th 122, 129 (4th Cir. 2021) (quoting Minnesota v. Carter, 525 U.S. 83, 88 (1998)). In order to successfully challenge a search allegedly violative of the Fourth Amendment, "a defendant must show both 'that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable.'" Smith, 21 F.4th at 129 (quoting Carter, 525 U.S. at 88). "The defendant bears the burden of demonstrating his legitimate expectation of privacy in the area searched." Smith, 21 F.4th at 130 (citing Rawlings v. Kentucky, 448 U.S. 98, 104 (1980)).

A legitimate expectation of privacy is not established solely through legitimate presence in a particular place. Rakas v. Illinois, 439 U.S. 128, 148 (1978). Nor does ownership of the item seized, by itself, confer a privacy interest in the area searched. United States v. Manbeck, 744 F.2d 360, 374 (4th Cir. 1984) ("The privacy interest that must be established to support standing is an interest in the area searched, not an interest in the items found . . . [O]wnership of the item seized is, by itself, insufficient to confer a privacy interest in the area searched"). Both legitimate presence and ownership of the items found should be considered in analyzing a legitimate expectation of privacy. See Rakas, 439 U.S. at 148; Manbeck, 744 F.2d at 374. But if a passenger

---

[2] The Government did ask Steele several questions on cross-examination, which he answered. Based on Steele's earlier assertion of his Fifth Amendment rights, the Court sustained an objection by Defendant's counsel and struck Steele's cross-examination answers.

11

asserts neither a property nor a possessory interest in the car and simultaneously disavows any interest in the seized objects, that passenger normally has no legitimate expectation of privacy. United States v. Rusher, 966 F.2d 868, 874 (4th Cir. 1992).

A mere passenger in a vehicle is entitled to a lesser expectation of privacy than an owner or driver of the vehicle. See Smith, 21 F.4th at 130; Manbeck, 744 F.2d at 374-75 ("[Defendant] could only show that he was a passenger in the van with the permission or acquiescence of [the owner/driver of the van]. This showing alone is insufficient to vest Defendant with an expectation of privacy in the van."); Rakas, 439 U.S. at 148 ("here petitioners' claim is one which would fail even in an analogous situation in a dwelling place, since they made no showing that they had any legitimate expectation of privacy in the glove compartment or area under the seat of the car in which they were merely passengers."). This interest is further diminished where the passenger also disclaims any interest in the items seized. See Moreno-Azua v. United States, No. 3:11-CR-386-FDW-DSC-1, 2016 SL 1563130 (W.D.N.C. Apr. 15, 2016) (citing United States v. Carter, 300 F.3d 415, 421 (4th Cir. 2002)) ("a car's passenger 'normally has no legitimate expectation of privacy in an automobile in which he asserts neither a property interest nor a possessory interest and where he disclaims any interest in the seized object.'").

Further, the Fourth Circuit has held that "both bystanders and recent passengers have lesser privacy interests than passengers." Smith, 21 F.4th at 131 (citing United States v. Rose, 3 F.4th 722, 730 (4th Cir. 2021)). A recent passenger's "inten[tion] to return to the vehicle" at some later time is "not sufficient to establish a legitimate expectation of privacy." Smith, 21 F.4th at 131. In Smith, the defendant rode as a passenger to a convenience store, where he exited the vehicle, leaving his personal cellphone in the car, while he entered the store. Id. at 130. The Fourth Circuit

held that the defendant did not have a "legitimate expectation of privacy in the vehicle." Id. at 131. The Fourth Circuit reasoned that:

> "[a]fter leaving the [vehicle], [Defendant] lost control over his phone: others could move or look through what had been left behind. When someone leaves personal belongings behind in another's car, he assumes the risk that the car's owner will consent to a search of the car or that the car's contents will come into plain view of the police."

Id. at 130. The Fourth Circuit further explained that "[f]undamentally, a person who cannot assert a legitimate claim to a vehicle cannot reasonably expect that the vehicle is a private repository for his personal effects." Id. (citing United States v. Hargrove, 647 F.2d 411, 412 (4th Cir. 1981)) (internal quotation marks omitted).

## IV. DISCUSSION

The central issues raised by Defendant's "Motion To Suppress And Memorandum In Support" (Document No. 25) are: does Defendant Dove have standing to move to suppress evidence recovered from the search of the Ford Explorer; and if so, was there probable cause to search the vehicle, and does the doctrine of inevitable discovery apply to the evidence recovered from the vehicle? The undersigned finds that Defendant has failed to meet his burden of establishing that he had a reasonable expectation of privacy in the Ford Explorer, and thus, he lacks standing to move to suppress evidence recovered from that search.

1. **Standing**

Defendant asserted in his briefing and at the hearing that he had an objectively and subjectively reasonable expectation of privacy in the Ford Explorer and thus has standing to contest the legality of the search. See (Document No. 34, pp. 5-6). Defendant argues in his reply brief that "[a]nyone who travels with friends in a car to an event location . . . is likely to return to that vehicle after the event in order to get home," and "[w]e have all been in this situation, and a

13

reasonable passenger believes that he or she can leave personal items in the car without exposing them to search by the police." (Document No. 34, p. 6). Thus, Defendant contends, "Mr. Dove therefore trusted that he could leave belongings in the car while they celebrated his friends' birthday at the restaurant," and "[i]n such circumstances, he had both a subjective and objective expectation of privacy in the automobile that was searched." Id. Defendant cites to no legal authority in his standing argument briefing. (Document No. 34, pp. 5–6).

Essentially, Defendant argues his intention to return to personal items he left in the Ford Explorer vests him with a privacy interest in that vehicle, absent the owner's consent to a police search. This argument has been squarely rejected by the Fourth Circuit. See Smith, 21 F.4th at 130–31. The defendant in Smith argued that "leaving his phone in the car demonstrates his legitimate expectation of privacy." Id. at 130. The Fourth Circuit held that the defendant's leaving personal possessions in the car was "one fact to be considered," but "does not by itself grant [Defendant] standing." Id. The Fourth Circuit further emphasized that "this is especially so given that Smith was no longer in the car when it was stopped." Id.

Additionally, the defendant in Smith argued that his intention to return to the vehicle should vest him with a privacy interest in the vehicle. The Fourth Circuit again disagreed, finding

> "[T]his glosses over the key point: Smith *left* the [vehicle]. The police did not stop the [vehicle] while Smith was in the car; nor was he just getting out as the police arrived. Instead, Smith was in the convenience store, well away from the [vehicle]. Though Smith claims that when he left the [vehicle] he intended to return, **subjective intentions are not sufficient to establish a legitimate expectation of privacy**. Otherwise, defendants could create impenetrable zones of privacy based solely on their say-so."

Id. at 131 (emphasis added).

The facts in this case are closely analogous to the Smith case. Here, Defendant rode as a passenger in the Ford Explorer, which he did not own. Defendant then voluntarily exited the

14

parked vehicle and was arrested around twenty minutes later at a location across the street. The police did not stop the vehicle, nor was Defendant just getting out as the police arrived. In fact, the starkest contrast between the facts here and the facts in Smith is that in Smith, the vehicle was still running, and the defendant had exited only to briefly run into a convenience store. Id. Here, by contrast, Defendant had walked across the street to a restaurant, ordered food and drinks, and was sitting on the patio before being arrested. No evidence suggests Defendant returned to the Ford Explorer after he initially exited the vehicle in the parking lot. Defendant was further from the Ford Explorer both spatially and temporally than Smith was from the vehicle in his case.

At the hearing, Defendant presented an Instagram post depicting Defendant with Shaquille Steele on Steele's birthday. According to Steele's testimony, he had a romantic relationship and multiple children with Shi'dae Sellers, who was the registered owner and the driver of the Ford Explorer.

Defendant contended at the hearing that his relationship to Steele strengthens his own privacy interest in the Ford Explorer. Defendant argues that because Steele posted a picture of himself with Defendant on Steele's birthday, they must be close friends. Because Defendant may be close friends with the partner of the owner and driver of the vehicle, Defendant asserts that Defendant's privacy interest in the vehicle is strengthened. The undersigned notes, however, that Steele testified at the hearing that he infrequently rode in the Ford Explorer. The undersigned does not find that Defendant's potential relationship to someone who is the romantic partner of the vehicle's owner vests Defendant with a privacy interest in that vehicle, especially in light of Steele's testimony that he, himself, infrequently rides in the Ford Explorer.

Defendant's counsel also noted that police did not receive consent to search the Ford Explorer. The undersigned finds that the vehicle owner's lack of consent to the police's search of

the Ford Explorer does not somehow vest Defendant with a personal privacy interest in that vehicle.

In closing argument, Defendant's counsel cited to two cases to support the argument that Defendant had a reasonable expectation of privacy in the vehicle. Defendant's counsel cited to Byrd v. United States, pointing to the Supreme Court's language that the court in Rakas v. Illinois "did not hold that passengers cannot have an expectation of privacy in automobiles," and further, "the Court disclaimed any intent to hold that a passenger lawfully in an automobile may not invoke the exclusionary rule and challenge a search of that vehicle unless he happens to own or have a possessory interest in it." Byrd v. United States, 584 U.S. 395, 406 (2018).

The undersigned agrees with Defendant that there is no automatic rule barring standing for a passenger of a vehicle to challenge a search of that vehicle. However, in this case, Defendant was not a passenger because he was not "**in** [the] automobile" when it was searched by police. Id. (emphasis added). At most, Defendant was a recent passenger because he had voluntarily exited the vehicle over twenty minutes prior to the search. The Fourth Circuit has "recognized that both bystanders and recent passengers have lesser privacy interests than passengers." Smith, 21 F.4th at 131. Thus, Dove's position is highly dissimilar to the Defendant in Byrd, who was *driving* the vehicle at the time it was pulled over and searched by State Troopers. Id.

Defendant also cited to Katz v. United States, pointing to the Supreme Court's language that "[n]o less than an individual in a business office, in a friend's apartment, **or in a taxicab**, a person in a telephone booth may rely on the protection of the Fourth Amendment. Katz v. United States, 389 U.S. 347–52 (1967) (emphasis added). Defendant's counsel contended that the "taxicab" language suggests that a privacy interest can be recognized for passengers with little connection to the vehicle itself. This argument, however, misses a key point: a taxicab passenger

16

would be *in* the vehicle.  Here, Defendant was no longer a passenger:  he had voluntarily exited the Ford Explorer over twenty minutes prior to the search.  Thus, whatever privacy interest a *passenger* may or may not have in the Ford Explorer is not relevant to Dove's privacy interest.

Here, the undersigned finds that Defendant has not met his burden of demonstrating a reasonable expectation of privacy in the Ford Explorer, and thus, Defendant does not have standing to argue that the search violated his Constitutional rights.

### 2. Probable Cause and Inevitable Discovery

Because the undersigned finds that Defendant has failed to meet his burden of demonstrating a reasonable expectation of privacy in the Ford Explorer, and thus lacks standing, the undersigned will respectfully decline to reach the questions of probable cause and inevitable discovery.

## V.  CONCLUSION

Defendant has no standing to allege a violation of his own Fourth Amendment rights based on officers' search of the Ford Explorer.  Defendant was not the owner of the Ford Explorer, he was not the driver, and he was not in the vehicle at the time of the search.  As a mere recent passenger, Defendant has not met his burden of establishing a reasonable expectation of privacy in the vehicle, which is necessary for Defendant to assert the search was violative of his own Fourth Amendment rights.

## IV.  RECOMMENDATION

**FOR THE FOREGOING REASONS**, the undersigned respectfully recommends that Defendant's "Motion To Suppress And Memorandum In Support" (Document No. 25) be **DENIED**.

## V.  TIME FOR OBJECTIONS

The parties are hereby advised that pursuant to 28 U.S.C. § 636(b)(1)(C), and Rule 72 of the Federal Rules of Civil Procedure, written objections to the proposed findings of fact, conclusions of law, and recommendation contained herein may be filed within **fourteen (14) days** of service of same.  Responses to objections may be filed within fourteen (14) days after service of the objections.  Fed.R.Civ.P. 72(b)(2).  Failure to file objections to this Memorandum and Recommendation with the District Court constitutes a waiver of the right to *de novo* review by the District Court.  Diamond v. Colonial Life, 416 F.3d 310, 315-16 (4th Cir. 2005);  United States v. Benton, 523 F.3d 424, 428 (4th Cir. 2008).  Moreover, failure to file timely objections will preclude the parties from raising such objections on appeal.  Id.  "In order 'to preserve for appeal an issue in a magistrate judge's report, a party must object to the finding or recommendation on that issue with sufficient specificity so as reasonably to alert the district court of the true ground for the objection.'"  Martin v. Duffy, 858 F.3d 239, 245 (4th Cir. 2017) (quoting United States v. Midgette, 478 F.3d 616, 622 (4th Cir. 2007)).

**IT IS SO RECOMMENDED**.

Signed: July 12, 2024

David C. Keesler
United States Magistrate Judge