## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION
## CASE NO.  3:23-CR-151-JAG-DCK

| | |
|---|---|
| UNITED STATES OF AMERICA,      ) | |
|               ) | **MEMORANDUM AND** |
|         **Plaintiff,**      ) | **RECOMMENDATION** |
|               ) | |
|     **v.**               ) | |
|               ) | |
| SHAMEL MALIK DOVE,      ) | |
|               ) | |
|         **Defendant.**      ) | |
| _____ ) | |

**THIS MATTER IS BEFORE THE COURT** on Defendant's "Motion To Suppress" (Document No. 64).  This motion has been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b) and is ripe for disposition.  Having carefully considered the briefs, testimony, and oral arguments, the undersigned will respectfully recommend that the motion be <u>denied</u>.

## I.  BACKGROUND

This matter arises following an arrest of Defendant Shamel Malik Dove ("Defendant" or "Dove") on May 8, 2023, at which time a black iPhone XR was seized from his person.  On May 17, 2023, Detective James Cameron ("Cameron") of the Charlotte-Mecklenburg Police Department ("CMPD") obtained a state warrant (the "May 17 Warrant") for the search of that phone.  (Document No. 64-2).  A search of Defendant's phone was conducted on May 30, 2023.

On July 14, 2023, United States Postal Inspector Jessica Adams ("Adams") obtained a federal warrant (the "July 14 Warrant") from the Honorable Susan C. Rodriguez to search another of Defendant's phones.  (Document No. 64-3).  The July 14 Warrant incorporated information gleaned from the May 30 search of Defendant's first phone pursuant to the May 17 Warrant.

On June 21, 2023, Defendant was indicted in this Court for: (1) possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1); (2) possession with intent to distribute fentanyl in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B); and (3) possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(i). (Document No. 1). Defendant, through prior counsel, filed a "Motion To Suppress And Memorandum In Support" (Document No. 24) on May 21, 2024, seeking to suppress certain Government evidence found pursuant to a motor vehicle search on the day of his May 8, 2023, arrest. On October 17, 2024, the Court denied Defendant's first "Motion To Suppress…" (Document No. 24). (Document Nos. 40, 49). New counsel was appointed for Defendant on January 9, 2025.

Defendant, through replacement counsel, filed a second "Motion To Suppress" (Document No. 64) on May 29, 2025, this time seeking to suppress certain Government evidence in the case related to the May 30, 2023, search of his black iPhone XR. The "Government's Response To Defendant's Second Motion To Suppress" (Document No. 66) was filed on June 11, 2025. Defendant's "Reply In Support Of Memorandum In Support Of Defendant's Motion To Suppress" (Document No. 67) was filed June 18, 2025.

The undersigned held a hearing on the "Motion To Suppress" (Document No. 64) on July 14, 2025.

The principal questions before the Court are: (1) the validity of the state warrant issued on May 17, 2023, for the search of Defendant's black iPhone XR cell phone; (2) the propriety of the search executed pursuant to the May 17 Warrant; and (3) the evidence subject to suppression.

## II. FACTUAL SUMMARY

As noted, the Court conducted a hearing in this matter on July 14, 2025, at which the parties presented witness testimony and argument. The Government presented the testimony of Detective

James Cameron ("Cameron") of the Charlotte-Mecklenburg Police Department ("CMPD"). Evidence also included cross-examination of the witness, presentation of arrest warrant and search warrant paperwork regarding Defendant, presentation of the forensic download of Defendant's black iPhone XR at issue, and communications between investigating officers regarding Defendant's case. The parties agreed that the May 17, 2023, state search warrant at issue (Document No. 64-2) (the "May 17 Warrant"), submitted with the written filings, should be considered as evidence in the factual record.

First, the Government presented the testimony of Detective Cameron. Detective Cameron has been employed with CMPD since July 21, 2017. Detective Cameron's employment with CMPD has been his only job in law enforcement. Detective Cameron's responsibilities with CMPD have included three years working as a patrol officer in uptown Charlotte, three years working on a street crimes unit in uptown Charlotte, and two and a half years working as a detective at CMPD headquarters. As a patrol officer, Detective Cameron generally responded to 911 calls. As a Task Force Officer ("TFO"), Detective Cameron's work was geared primarily toward conducting firearm and narcotic investigations and also included responding to violent crimes that happened within his division, such as shootings or robberies.

Detective Cameron testified that, as a patrol officer, he came into contact with individuals in possession of illegal drugs on their person approximately several hundred times and he came into contact with firearms around a hundred times. Detective Cameron was responsible for arresting, charging, or applying for arrest warrants for individuals suspected of firearms or drug offenses and testified that he applied for arrest warrants regarding drug and gun charges "probably a couple dozen" times. When Detective Cameron believed he had probable cause to arrest someone, he would transport them to Mecklenburg County Jail and testify to a state magistrate as

3

to why he was bringing them there, and there would be no warrant issued before the arrest was made. Detective Cameron testified that he made probably a hundred "on-the-spot" arrests related to either drugs or firearms.

Detective Cameron testified as to the differences he perceived between individuals in possession of drugs with intent to use them ("users") and individuals in possession of drugs with intent to traffic them ("dealers"). He expected users to possess smaller amounts of narcotics and paraphernalia for use, whereas dealers would often possess scales, baggies, other packaging supplies, U.S. currency in different denominations, and occasionally firearms. Charges for either crime—possession or dealing—were common in Mecklenburg County, and arrests for either were typically made on the spot.

As a TFO, Detective Cameron worked in a crime reduction unit, and he came into contact with drug dealers during his work on that unit as well. He worked with informants who were users and informants who were dealers, and he learned about the drug trade through these sources. He made approximately 150 to 200 arrests while on a crime reduction unit task force, and over half of those arrests were connected in some way to drugs or guns. Detective Cameron participated in undercover work as a surveillance officer, although he never bought drugs in an undercover capacity. As a surveillance officer, he participated in approximately a hundred undercover deals involving all types of narcotics, including pills. Detective Cameron testified that the typical user would carry no more than the amount of pills that could fit in a basic prescription bottle. Detective Cameron further testified that these undercover purchases were set up through communication typically involving either a phone call or a text message.

In May of 2023, Detective Cameron was aware of the investigation of Shaquille Steele ("Steele"), although Steele was not the primary focus of Detective Cameron's investigation.

4

Detective Cameron also became involved in an investigation of Defendant. At the time, Detective Cameron was on a unit that primarily investigated high-end motor vehicle thefts from private dealerships and residences, and he was aware that Defendant had been posting images of himself with a newer model Chevrolet Corvette on his Instagram. Detective Cameron saw that several days later, a silver Chevrolet Corvette with the same license plate as the one on Defendant's Instagram was recovered from Defendant's apartment complex. Detective Cameron applied for an arrest warrant because of that information. That arrest was effectuated on May 8, 2023, which led to the application for the state search warrant (Document No. 64-2) (the "May 17 Warrant") at issue in the instant motion.

On May 8, 2023, Detective Cameron observed an Instagram post of Defendant and Steele standing in front of a business. Detective Cameron knew that Defendant had an unrelated indictment pertaining to a prior investigation and law enforcement had an order for arrest. As mentioned above, Detective Cameron obtained a warrant to arrest Defendant for possession of a stolen motor vehicle. Detective Cameron knew Steele was on electronic monitoring, which could help law enforcement locate Defendant.

Detective Cameron's affidavit submitted in connection with the May 17 Warrant outlines the circumstances of Defendant's arrest on May 8, 2023. Law enforcement recovered a firearm from inside of Defendant's pants, and several hundred blue pills totaling ninety-eight (98) grams of fentanyl were recovered from a vehicle where Defendant had previously been sitting. Detective Cameron testified that, in his experience, ninety-eight (98) grams of fentanyl is not "anywhere close" to what a user would typically have on their person.

After Defendant was arrested pursuant to the outstanding order for his arrest in connection with the stolen motor vehicle investigation, Defendant was also charged with crimes related to the

fentanyl and firearm recovered on May 8.  Detective Cameron submitted an affidavit to a state magistrate seeking to charge Defendant with possession of a firearm by a felon and trafficking in opium.  This arrest paperwork was admitted as Government's Exhibit 10.

The affidavit submitted by Detective Cameron in connection with the arrest paperwork states that on Monday, May 8, 2023, officers and detectives were conducting a fugitive apprehension operation for Defendant, who had a grand jury indictment and a warrant for arrest, both from Mecklenburg County, North Carolina.  Detectives observed Defendant exit the back right passenger seat of a silver 2018 Ford Explorer at 1705 Scott Avenue and walk to a restaurant, where Defendant's party was eventually seated on the front patio.  Detectives attempted to arrest Defendant on the patio of the restaurant.  Defendant tried to run from police on East Boulevard and had to be tackled to the ground to be placed into handcuffs.  During a search incident to the arrest of Defendant, a Glock 19 nine-millimeter handgun was found inside of his underwear.  Police walked to the Ford Explorer and observed a single bag of blue pills in plain view in the right rear passenger seat, which was seized during a probable cause search of the vehicle and constituted ninety-eight (98) grams of fentanyl pills.

The magistrate who reviewed this affidavit charged Defendant with possession of a firearm by a convicted felon and trafficking in opium.

Law enforcement also seized Defendant's phone from his person on May 8, 2023, and applied for a warrant to search the phone several days later, on May 17, 2023.  A state magistrate authorized the search warrant.  Detective Cameron testified that he expected to find evidence of narcotics sales and possession of a firearm by a felon on Defendant's phone.  Detective Cameron testified that the warrant application sought permission to look at Defendant's call logs and messages, location data, and photos and videos saved on the phone.  Detective Cameron did not

spell out in detail in the affidavit that cell phone communication is required to facilitate narcotics trafficking, because it seemed apparent to him. Detective Cameron testified that location data can be relevant evidence with the respect to the location of drug deals, and photos and videos are often sent to potential buyers to showcase what is being sold.

Detective Cameron testified that he has probably searched over 300 phones pursuant to a warrant, and over ninety percent of the phones related to individuals suspected of dealing drugs contained evidence of drug dealing on the phone. He reviewed around 100 of those 300 phones for evidence of unlawful firearms possession and found relevant evidence again in around ninety percent of those 100. Most all of these phone searches involved both guns and drugs together.

After obtaining the May 17 Warrant, Detective Cameron searched the contents of Defendant's phone. In general, phones to be searched are turned over to the cyber unit, which dumps the contents of the phone and returns them to the searching officer. Detective Cameron testified that, in general, he tries to search keywords in text messages and limit the amount of photos he looks at when searching phones because the content dump returns thousands of irrelevant photos, captions, and emojis. He typically starts with searching media and narrows the images by typing "DCIM" into a search bar, which returns images captured by the device—usually between several hundred and several thousand images. The search returns thumbnails, or small previews of the images, and the search screen displays around twelve to twenty thumbnail photos that can be enlarged to confirm the contents of the photo. In reviewing these thumbnails, sometimes the evidentiary value is apparent, and other times it is unclear. When the evidentiary value of the photo is unclear from the thumbnail, Detective Cameron enlarges the photo. This is the process he used when searching Defendant's phone.

Detective Cameron testified that, when searching device-captured images from Defendant's phone and scrolling through the thumbnails, he saw images of guns and drugs, images that had nothing to do with guns and drugs, and images that he had to look more closely at to determine their evidentiary value. He also saw images that weren't guns or drugs but that he knew were connected to a crime as soon as he saw them, such as images of financial cards in other people's names, washing of checks, and high-end motor vehicles.

Detective Cameron similarly searches keywords when reviewing messages on the phone. He does not recall all of the keywords that he used to go through messages on Defendant's phone. He is certain he would have searched keywords like "blues," "fent," "pills," "Glock," and "switch." He found messages related to illegal firearm possession and drug trafficking using these keyword searches and read through those messages. One discussion regarding guns was located in a text thread also discussing suspected fraud. Detective Cameron did not try to build his own investigation into suspected fraud related to these messages or the above-described images of check washing. At the time of the search, Detective Cameron did not have evidence showing that Defendant was stealing cars, and he believed the case for firearm and narcotics charges was "a lot stronger and better" and that prosecution for those charges would be more serious.

A forensic download constituting a full copy of the contents of Defendant's phone that Detective Cameron reviewed when executing the search warrant was admitted as the Government's Exhibit 11. The Government provided a visual presentation of how Detective Cameron's search of Defendant's phone might have looked, as described above.

On cross-examination, Detective Cameron testified that there was surveillance conducted the day of Defendant's arrest, and none of that surveillance revealed any sort of drug deal. Detective Cameron testified that the day of Defendant's arrest, Mr. Steele was on electronic

monitoring for a pending charge. The surveillance conducted that day revealed there were four people in the car where the drugs were found, including someone sitting in the backseat who left the scene without being identified, and two other people in the car who could reach to the backseat. Detective Cameron did not actually witness anyone enter or exit the vehicle. When the drugs were found in the car, no one was in the vehicle. The driver of the vehicle also had an arrest warrant pending on the day of Defendant's arrest. No drugs, scales, ledgers, or drug paraphernalia were found on Defendant that day.

Detective Cameron confirmed he was responsible for drafting the affidavit and warrant to search Defendant's phone. The warrant lists two crimes: possession of a firearm by a convicted felon and trafficking opium. Detective Cameron's sergeant, Sergeant Miguel Jaco-Vargas, reviewed the warrant after Detective Cameron drafted it. The warrant discusses Detective Cameron's experience and assignment with the crime reduction unit, and specifically his full-time assignment to Operation SCARLET (Stolen Car and Recovery Law Enforcement Team). The warrant references Detective Cameron's investigation of Defendant for possession of a stolen motor vehicle, but does not reference a background investigation into firearm or drug possession.

The warrant summarizes the interaction at the restaurant on May 8, 2023, mentions the unknown black male who exited the back left passenger seat, and mentions that there were two other people in the vehicle. The warrant discusses law enforcement's attempts to effectuate the arrests of the driver, Shi'dae Monique Sellers ("Sellers"), and Defendant. The warrant discusses Defendant's arrest and the recovery of a firearm from his underwear, but does not describe any drugs having been found on Defendant. The warrant notes that ninety-eight grams of fentanyl pills were found in the backseat of the car. The warrant contains standard, general language involving

9

cell phones and related storage devices. The warrant requests permission for law enforcement officers to analyze and extract data from Defendant's phone.

Nothing in the warrant mentions Detective Cameron's experience in investigating drug trafficking or the connection in some cases that guns may have with drug trafficking. Nothing in the warrant mentions any evidence or surveillance showing Defendant involved in any drug trafficking. The only fact regarding Defendant's phone in the affidavit is the fact that it was found on his person at the time of his arrest.

Defense counsel asked if Detective Cameron had documentation detailing his search of Defendant's phone on May 30, 2023. Detective Cameron testified he does not recall writing down any particular notes regarding how or what he searched in Defendant's phone; he just knows what he would have done based on how he routinely conducts searches in similar investigations. Detective Cameron testified he is not aware of any documentation at all that details how he searched Defendant's phone on May 30, 2023. Detective Cameron testified he understands that search warrants set boundaries for the search, and he believed that what is written in the May 17 Warrant covered a search of all parameters within the phone for specific types of crimes.

During his work with Operation SCARLET, Detective Cameron interacted with various agencies, including the United States Postal Inspector. In this case, he believes he first communicated with United States Postal Inspector Jessica Adams ("Adams") after Defendant's arrest on May 8, 2023, and prior to searching Defendant's phone on May 30, 2023. Detective Cameron discussed the investigation into Defendant with Inspector Adams. Approximately nine days after the search of Defendant's phone, Detective Cameron communicated with Inspector Adams via email. Defense counsel introduced this email communication as Defense Exhibit 1. The email references an attached statement including a general idea of the entire investigation into

Defendant. Defense counsel introduced the attached statement as Defense Exhibit 2. This statement contains a general description of the events of May 8, 2023, that looks similar to the language in the affidavit for the May 17 Warrant. The statement describes theft of mail keys, vehicle thefts, carjacking, and other fraudulent activity, but does not describe a drug trafficking investigation.

Defendant was subsequently arrested pursuant to a federal warrant, at which time another phone was seized. Detective Cameron provided Inspector Adams with information relevant to her application for a federal warrant to search the second phone (the "July 14 Warrant"); Detective Cameron also reviewed that warrant. Inspector Adams's sworn affidavit for the July 14 Warrant, submitted with Defendant's motion, states that the May 17 Warrant was obtained to search the first cell phone for evidence of trafficking opium and Defendant's involvement with high-end vehicle thefts and that the phone was reviewed for evidence of drug trafficking and stolen motor vehicles.

On re-direct, Detective Cameron testified that the investigation statement listed a number of charges for Defendant in 2023, including one arising from a February 2023 arrest for possession of a different firearm than the one recovered on May 8, 2023. Detective Cameron testified that his search warrant for the phone seized on May 8 was for the crimes of possession of firearm by felon and trafficking in opium. Detective Cameron testified that at the time of Defendant's arrest on May 8, 2023, he did not know how Defendant, a convicted felon, was able to obtain the firearm that was recovered from his person. Detective Cameron testified that every time he looks at a phone, he always limits the images by "DCIM."

On re-cross, Detective Cameron confirmed that he had no documentation detailing how he searched Defendant's phone and that the search of Defendant's phone occurred over two years

11

ago.  Detective Cameron testified that the routine he described during the hearing reflects his search process for every phone he looks at.

### III.  STANDARDS OF REVIEW

The Fourth Amendment safeguards "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. CONST. amend. IV. "[W]here a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing, …reasonableness generally requires the obtaining of a judicial warrant."  Riley v. California, 573 U.S. 373, 382 (2014) (quoting Vernonia School Dist. 47J v. Acton, 515 U.S. 646, 653 (1995)).  The Fourth Amendment further provides that "no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. CONST. amend. IV.

Thus, "[a] warrant must be supported by probable cause, which requires a magistrate 'to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, …there is a fair probability that contraband or evidence of a crime will be found in a particular place.'"  United States v. Davis, 94 F.4th 310, 316 (4th Cir. 2024) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)).  A valid search warrant must also "particularly describe the place to be searched, and the persons or things to be seized."  United States v. Uzenski, 434 F.3d 690, 706 (4th Cir. 2006) (quoting United States v. Robinson, 275 F.3d 371, 381 (4th Cir. 2001)) (cleaned up).  The protections of the Fourth Amendment also extend to the execution of the warrant, "such that officers cannot 'grossly exceed the scope of a search warrant in *seizing* property.'"  Id. (quoting United States v. Foster, 100 F.3d 846, 849–50 (10th Cir. 1996) (emphasis in original).

"The evidentiary fruits of Fourth Amendment violations are generally inadmissible at trial." United States v. Aigbekaen, 943 F.3d 713, 725 (4th Cir. 2019) (citing Wong Sun v. United States, 371 U.S. 471, 484–85 (1963)). Whether the exclusionary sanction is appropriate presents "an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct." United States v. Leon, 468 U.S. 897, 906 (1984) (quoting Illinois v. Gates, 462 U.S. 213, 223 (1983)). "The 'sole purpose' of the exclusionary rule is to deter future violations of the Fourth Amendment." United States v. Burton, 756 Fed. App'x 295, 301 (4th Cir. 2018) (quoting Davis v. United States, 564 U.S. 229, 236–37 (2011)). Accordingly, pursuant to the "good faith exception" to the exclusionary rule, "evidence obtained by 'officers reasonably relying on a warrant issued by a detached and neutral magistrate'" may be admissible. United States v. Wilhelm, 80 F.3d 116, 121 (4th Cir. 1996) (citing Leon, 468 U.S. 897, 913)).

## IV. DISCUSSION

The central issues raised by Defendant's motion are: (1) the validity of the state warrant issued on May 17, 2023 (the "May 17 Warrant"), for the search of Defendant's black iPhone XR cell phone; (2) the propriety of the search executed pursuant to the May 17 Warrant; and (3) the evidence subject to suppression as a result of any Fourth Amendment violations.

This is a challenging case, and the interplay of the issues raised presents interesting questions. The Government intends to offer evidence related to the offenses specified in the May 17 Warrant. For the reasons that follow, the undersigned is persuaded that such evidence was obtained in good faith reliance on a warrant issued by a detached and neutral magistrate and may be properly admitted. Because the undersigned finds that the good faith exception applies to the

13

evidence at issue, the undersigned assumes, without deciding, that the May 17 Warrant was defective, as described below.

Next, even if the May 30 search of Defendant's iPhone exceeded the scope permitted by the May 17 Warrant, the Government does not intend to offer evidence beyond what was reasonably authorized. The undersigned cannot conclude that Detective Cameron's conduct in executing the search was so improper as to make blanket suppression the appropriate remedy in this case. Accordingly, the undersigned will respectfully recommend that Defendant's motion be denied, and that the evidence reasonably authorized by the May 17 Warrant—the only evidence at issue—be admitted.

## A. Validity of May 17 Warrant and Applicability of the Good Faith Exception

The undersigned has carefully considered Defendant's arguments that the May 17 Warrant is defective due to insufficient probable cause and insufficient particularity, as discussed below. Ultimately, the undersigned concludes that the officers reasonably relied in good faith on the May 17 Warrant to conduct a search for evidence of the crimes specified in the warrant: possession of a firearm by a convicted felon and trafficking opium. In so finding, the undersigned assumes, without deciding, that the May 17 Warrant was defective.

### 1. Probable Cause and Particularity

Defendant argues that the May 17 Warrant was not supported by probable cause and also "fails to satisfy the Fourth Amendment's particularity requirement." (Document No. 64-1, pp. 2, 6). With respect to probable cause, Defendant contends "a warrant that is based upon 'conclusory allegations' should not be upheld." Id. at p. 3 (citing United States v. Wilhelm, 80 F.3d 116, 119 (4th Cir. 1996)). Defendant further contends that there must be "a nexus between the place to be searched and the items to be seized." Id. (citing United States v. Burton, 756 F. App'x 295, 302

(4th Cir. 2018)).  Defendant contends "the Warrant, on its face, does not describe any facts, other than conclusory allegations, that probable cause existed to search the contents of the phone."  Id.

With respect to particularity, Defendant contends "[t]he Fourth Amendment requires that a search warrant describe the things to be seized with sufficient particularity to prevent a general exploratory rummaging in the person's belongings."  Id. at p. 6 (citing Coolidge v. New Hampshire, 403 U.S. 443, 467 (1971)).  Defendant argues that the May 17 Warrant "failed to describe the items with sufficient specificity to enable the executing officer to clearly identify what was authorized to be searched for and seized."  Id. at pp. 6–7 (citing United States v. Blakeney, 949 F.3d 851, 862 (4th Cir. 2020)).  Defendant cites United States v. Williams, 592 F.3d 511, 519 (4th Cir. 2010), for the proposition that "[t]he particularity requirement is fulfilled [when] the warrant identifies the items to be seized by their relation to designated crimes and when the description of the items leaves nothing to the discretion of the officer executing the warrant."  Id. at p. 7.

In response, the Government contends "[a] determination of probable cause by a neutral and detached magistrate judge is entitled to substantial deference by a subsequent reviewing court."  (Document No. 66, p. 2).  The Government further contends "[t]he magistrate had a substantial basis for concluding that the facts recited in the warrant application made it reasonable to believe evidence of drug trafficking would be on Dove's iPhone XR."  Id. (citing United States v. Ventresca, 380 U.S. 102, 109 (1965)).  The Government asserts:  "Dove was armed with a firearm, had the iPhone XR in his pocket, and police recovered almost 100 grams of fentanyl where Dove had been sitting in a car.  Dove had also attempted to flee from law enforcement before he was seized."  Id.  The Government further asserts "[d]rug trafficking is a crime that necessarily requires coordination of manufacturers, buyers and sellers," and "[n]aturally, such coordination is

15

likely to be conducted by phone."  Id. (citing United States v. Davis, 94 F.4th 310, 320 (4th Cir. 2024);  United States v. Orozco, 41 F.4th 403, 411 n.9 (4th Cir. 2022)).

With respect to particularity, the Government contends that "[a] warrant satisfies the particularity requirement when an executing officer can reasonably ascertain and identify the place to be searched."  (Document No. 66, p. 3) (citing United States v. Blakeney, 949 F.3d 851, 861 (4th Cir. 2020)).  The Government contends "[t]he test is one of reasonableness," and "[t]his is true even if evidence is likely to be found within a broad category of items."  Id.  The Government further contends "[a] warrant that specifically identifies the crime or crime[s] thought to have been committed is consistent with the Fourth Amendment and does not constitute a general warrant."  Id. (citing United States v. Oloyede, 982 F.2d 133, 138 (4th Cir. 1992)).

In this case, the Government asserts, "[t]he state magistrate authorized the search of a 'Black iPhone XR (inside a black Air Jordan phone case with a red/white/black shoe on the rear' for evidence of the North Carolina State crimes of possession of firearm by convicted felon and trafficking in opium and evidence of the identity of a person engaged in said crimes."  Id. at pp. 3–4.  The Government further asserts the May 17 Warrant authorized the seizure of enumerated categories of digital evidence, including call logs, messages, browser history, mapping and GPS information, and media files.  Id. at p. 4.  The Government thus contends "[t]he warrant issued by the magistrate was particular and explicit in articulating the crimes for which evidence was sought, what was to be searched, and what was to be seized."  Id.

Defendant replies that the Government's "recitation of the factual background, on which Detective Cameron also relied, does not show any nexus between the events that occurred on May 8, 2023[,] and the search of [Defendant's phones]."  (Document No. 67, p. 1).

16

As noted above, the undersigned will assume, without deciding, that the May 17 Warrant was defective. Although the warrant appears sufficiently particular,[1] the issue of probable cause presents a much closer call. Courts "review a magistrate judge's decision to issue a search warrant with 'great deference,' asking only 'whether the judicial officer had a "substantial basis" for finding probable cause.'" United States v. Blakeney, 949 F.3d 851, 859 (4th Cir. 2020) (quoting United States v. Jones, 942 F.3d 634, 638 (4th Cir. 2019)). But "[w]hen reviewing the probable cause supporting a warrant, a reviewing court must consider only the information presented to the magistrate who issued the warrant." United States v. Wilhelm, 80 F.3d 116, 118 (4th Cir. 1996) (citing United States v. Blackwood, 913 F.2d 139, 142 (4th Cir. 1990)).

Here, the inclusion of additional information in the affidavit may have sufficed to make probable cause obvious on the face of the warrant, such as descriptions of Detective Cameron's experience with narcotic and firearms investigations, his understanding that the quantity of drugs found where Defendant was sitting were indicative of trafficking, and his knowledge that drug traffickers rely on their cell phones to facilitate sales. But, as counsel for Defendant emphasized during the evidentiary hearing, these assertions do not appear in the affidavit. It appears to the undersigned that the nexus alleged in the warrant between the drug and firearm charges and Defendant's *phone* is attenuated, at best.

---

[1] In addition to specifying the phone to be searched, the categories of data to be reviewed, and the crimes for which the executing officer sought evidence, the affidavit posits that the phone was "used during the commission of the crime of possession of a firearm by a convicted felon and trafficking opium and may have images, stored data, text messages, and telephone numbers or records related to the commission of the aforementioned crimes" and "is a means by which the suspect committed the criminal offenses under investigation." (Document No. 64-2, p. 5). At the evidentiary hearing, Defendant emphasized that the affidavit refers to cellular telephones in the plural; Detective Cameron testified that this was an error. For purposes of assessing particularity, the undersigned observes that the warrant clearly specifies the item to be searched as a "Black iPhone XR (inside a black Air Jordan phone case with a red/white/black shoe on the rear). Id. at p. 2.

In short, while the May 17 Warrant may not fairly be characterized as "bare bones," it is nonetheless insufficient by the standards of the undersigned with respect to probable cause. But, as the Government argues, that is not the question before the Court. Ultimately, because the undersigned is satisfied that the good faith exception applies to the evidence at issue as described below, the undersigned will assume without deciding that the May 17 Warrant was not supported by sufficient probable cause.

### 2. Good Faith Exception

Defendant acknowledges that "under the 'good faith' exception, 'evidence obtained from an invalidated search warrant will be suppressed only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause.'" (Document No. 64-1, p. 10) (quoting United States v. Lalor, 996 F.2d 1578, 1583 (4th Cir. 1993)) (cleaned up). Defendant asserts that "the good faith exception has limits," and there are four situations in which the good faith exception would not apply:

> (1) the magistrate was misled by information in an affidavit that the officer knew was false or would have known was false except for the officer's reckless disregard of the truth;
> (2) the magistrate wholly abandoned his detached and neutral judicial role;
> (3) the warrant was based on an affidavit that was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and
> (4) the warrant was so facially deficient, by failing to particularize the place to be searched or the things to be seized, that the executing officers cannot reasonably presume it to be valid.

Id. (citing United States v. Leon, 468 U.S. 897 (1984)).

Defendant further argues that "evidence should be suppressed if it can be said that the law enforcement [officer] had knowledge, or may properly be charged with knowledge, that the search warrant was unconstitutional under the Fourth Amendment." Id. at p. 11 (citing Illinois v. Krull,

480 U.S. 340, 348–49 (1987)).  Defendant contends "the officers should not be granted the protection of the Good-Faith exception because they utilized the warrant as a pretext to search for evidence of crimes unrelated to those specified in the warrant application."  Id. at pp. 11–12.  In this case, Defendant argues, "the officers knowingly conducted a search beyond the scope authorized by the warrant they had secured, justifying the suppression of the evidence obtained."  Id. at p. 12.

The Government responds that "if the officers relied in objective good faith on a search warrant, [the exclusionary] rule does not apply even if the search warrant lacked probable cause." (Document No. 66, p. 6) (citing Leon, 468 U.S. at 920).  The Government asserts that the good faith exception "applies unless 'a reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization.'"  Id. (citing Leon, 468 U.S. at 922 n.23).  The Government asserts "[o]ur courts have acknowledged that drug traffickers will often have evidence of drug trafficking crimes preserved on their phones."  Id. (citing United States v. Davis, 94 F.4th 310 (4th Cir. 2024);  United States v. Orozco, 41 F.4th 403, 411 n.9 (4th Cir. 2022)).  Thus, the Government contends, "any reliance on the May 17 warrant was reasonable even if this Court were to disagree with the state magistrate's finding of probable cause," and "[t]he officers relied on the May 17 warrant in good faith."  Id.

Defendant replies that "[i]n this case, the [G]overnment's conduct does not afford them the protection of the good-faith exception, and the exclusionary rule supports suppression of all evidence obtained from the search of Mr. Dove's phone."  (Document No. 67, p. 5).  Defendant contends that  "[e]ven if the warrant was valid (it was not) and unambiguous, then there is no good-faith exception because the [G]overnment admittedly exceeded the scope of the face of the warrant to search for additional evidence."  (Document No. 67, p. 5) (citing United States v. Ray, 141 F.4th

129, 139 (4th Cir. 2025) ("[T]he Government cannot fall back on the good faith exception when it unreasonably exceeds the scope of an unambiguous warrant.")).

The undersigned first observes that under the good faith exception to the exclusionary rule, "evidence obtained by an officer who acts in objectively reasonable reliance on a search warrant will not be suppressed, even if the warrant is later deemed invalid." United States v. Ray, 141 F.4th 129, 134 (4th Cir. 2025) (quoting United States v. Thomas, 908 F.3d 68, 72 (4th Cir. 2018)). "[S]earches conducted 'pursuant to a warrant will rarely require any deep inquiry into reasonableness, for a warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search.'" United States v. Williams, 548 F.3d 311, 317 (4th Cir. 2008) (quoting Leon, 468 U.S. at 922)). As Defendant notes, the Fourth Circuit has recognized "four limited instances in which the good faith exception does not apply." United States v. Burton, 756 Fed. App'x 295, 301 (4th Cir. 2018).

With respect to evidence of the firearm and narcotics charges at issue, the undersigned is satisfied that this case does not fall within those four limited instances. The undersigned observes no falsehoods in the affidavit. Officer Cameron testified credibly to his virtual certainty that evidence of the listed charges would be found within Defendant's phone. As discussed above, the affidavit may not fairly be characterized as "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," or "so facially deficient…that the executing officers cannot reasonably presume it to be valid." Leon, 468 U.S. at 923.

As the Government emphasized at the evidentiary hearing, an arrest warrant for the same crimes as those listed in the May 17 Warrant was issued by a magistrate on substantially the same facts. Both Detective Cameron's supervisor *and* a magistrate reviewed the May 17 Warrant and were satisfied that probable cause existed to search Defendant's phone for evidence of those

crimes. In short, the undersigned cannot conclude that a reasonably well-trained officer should have known the search of Defendant's phone for evidence of narcotics and firearm crimes was illegal in light of all the circumstances. See, e.g., United States v. Ray, 141 F.4th 134 (4th Cir. 2025). The undersigned is satisfied that Detective Cameron's reliance on the May 17 Warrant to search Defendant's phone for evidence of the crimes specified in the warrant was reasonable.

Defendant cites Ray for the proposition that "the Government cannot fall back on the good faith exception when it unreasonably exceeds the scope of an unambiguous warrant." (Document No. 67, p. 5) (citing Ray, 141 F.4th 129, 139 (4th Cir. June 3, 2025)). But Ray appears distinguishable from the instant matter. In Ray, law enforcement's search of a phone clearly exceeded the scope of a valid warrant authorizing only the phone's *seizure*. Id. at 132, 135–36. The Fourth Circuit declined to apply the good faith exception to a search that unreasonably exceeded the scope of a valid, but unambiguous warrant. Id. at 139.

Here, a search of Defendant's phone for evidence of the listed crimes—possession of a firearm by a felon and trafficking opium—appears within the reasonable scope of the May 17 Warrant. Whether the May 17 Warrant can reasonably be read to authorize a search of Defendant's phone for evidence of vehicle theft and fraud presents a more challenging question. However, the Government does not intend to offer any such evidence, and Defendant is not being charged with any such crimes. Thus, to the extent Defendant contends the Government cannot claim the good faith exception in admitting evidence of other crimes, the issue appears moot.

Defendant urges the Court to find that, because Detective Cameron appears to have searched the phone for evidence outside the reasonable scope of the warrant, he cannot claim the good faith exception for evidence reasonably within its scope. In essence, then, Defendant seeks blanket suppression of all evidence obtained from the search, because the officer's conduct in

exceeding the scope was so allegedly unreasonable.  This analysis appears distinct from whether the May 17 Warrant reasonably authorized the search for and seizure of the evidence at issue.  The undersigned will thus consider separately whether, if Detective Cameron violated Defendant's Fourth Amendment rights in exceeding the permissible scope of the warrant, blanket suppression would be the appropriate remedy.

### B.  Scope Of Search And Blanket Suppression As Remedy

Defendant contends the May 30, 2023, search of Defendant's phone "clearly exceeded the scope of the warrant."  (Document No. 64-1, p. 7).  Defendant argues "[b]lanket suppression is…appropriate where the warrant application merely serves as a subterfuge masking the officers' lack of probable cause for a general search, or where officers flagrantly disregard the terms of the warrant."  Id. (citing United States v. Uzenski, 434 F.3d 690, 706 (4th Cir. 2006)).  Defendant contends the May 17 Warrant application "served as a pretext to cover the officers' lack of probable cause for conducting a general search, and officers knowingly disregarded the warrant's specific terms."  Id. at p. 8.  Defendant further contends the officers' "actions amount to a fishing expedition for incriminating evidence, as confirmed by sworn statements in the July 14, 2023[,] Search Warrant."  Id.

Specifically, Defendant contends the May 17 Warrant, if valid at all, would have only authorized searches for firearm possession and opium trafficking, and "no officer could have reasonably interpreted the May 2023 warrant to authorize a search for crimes involving car thefts or fraudulent financial instruments."  Id.  Defendant further contends "the plain view exception to the warrant requirement does not apply for two reasons:  first, officers intentionally engaged in a search that exceeded the scope of the warrant;  and second, the evidence of alleged stolen car thefts and fraud…would not have been immediately apparent."  Id. at p. 9.

The Government responds that "[e]vidence of Dove's firearm possession and drug trafficking were properly discovered and seized within the particularly described scope of the warrant," and "[t]he discovery of evidence of additional crimes should not trigger the suppression of evidence within the scope of the May 17 warrant." (Document No. 66, p. 4). The Government further asserts it "only intends to offer evidence of drug trafficking and firearms possession recovered from Dove's phone and has no intention of introducing evidence of Dove's other crimes." Id. The Government contends "[t]he plain-view exception could apply here to the evidence of fraud and theft discovered on Dove's phone, but the Government is not seeking to use any such evidence." Id.

The Government cites United States v. Srivastava, 540 F.3d 277, 293 (4th Cir. 2008), for the proposition that "[a]s a general rule, if officers executing a search warrant exceed the scope of the warrant, only the improperly-seized evidence will be suppressed; the properly-seized evidence remains admissible." (Document No. 66, p. 5). The Government asserts "[b]lanket suppression is an extraordinary remedy reserved only for extreme violations." Id. (citing United States v. Uzenski, 434 F.3d 690, 706 (4th Cir. 2006)). The Government contends that "[e]ven if the Court finds that the officers went beyond the warrant's scope, the conduct was not so egregious as to merit the blanket suppression sought by Dove." Id.

Defendant replies that the Government's "claims that the plain-view exception 'could' apply, and that evidence of other crimes was found within the scope of the warrant are contradicted by the sworn statements provided by the United States Postal Inspector to this Court." (Document No. 67, p. 4). Defendant asserts that "[n]otably, the sworn statement specifies that '[a] subsequent state search warrant was obtained to search the cell phone for evidence of trafficking opium and S.D.'s involvement with high-end vehicle thefts.'" Id. (citing Document No. 64-3, p. 6).

Defendant contends "[t]his indicates that the investigators did not inadvertently discover evidence of other crimes; rather, they deliberately searched for evidence related to other crimes, including stolen motor vehicles." Id.

The undersigned agrees with the Government. Even if the May 30 search of Defendant's phone exceeded the scope permitted by the May 17 Warrant, any evidence outside the warrant's reasonable scope is not at issue, and the undersigned cannot conclude that blanket suppression is appropriate in this case. The undersigned is not persuaded that the May 17 Warrant application "merely serve[d] as a subterfuge masking the officers' lack of probable cause for a general search," or that Detective Cameron's disregard of the terms of the warrant was "so extreme that the search [was] essentially transformed into an impermissible general search" warranting the "extraordinary remedy" of blanket suppression. United States v. Uzenski, 434 F.3d 690, 706 (4th Cir. 2006).

The undersigned credits Detective Cameron's testimony that he had reason to believe Defendant's phone would contain evidence of crimes related to narcotics and firearms possession and that he searched the phone for evidence of those specific crimes after obtaining a warrant. While Inspector Adams's affidavit does indicate Detective Cameron obtained the May 17 Warrant to search the phone for evidence of vehicle thefts, it also supports that Detective Cameron obtained the May 17 Warrant to search the phone for evidence of trafficking opium. The undersigned further credits Detective Cameron's testimony that he searched Defendant's phone in keeping with his general practice. The undersigned cannot conclude that the record reflects a "flagrant disregard" for the terms of the warrant or other indicia of bad faith by Detective Cameron.

In short, even if Detective Cameron's search of Defendant's phone for evidence of vehicle thefts exceeded the scope permitted by the May 17 Warrant, it appears to the undersigned that the appropriate remedy for that violation would be the suppression of the evidence not reasonably

24

authorized by the May 17 Warrant. And, as described above, the undersigned is persuaded that the seizure of evidence related to the narcotic and firearm charges listed in the May 17 Warrant was lawful, and the Government has asserted it will only offer evidence related to those charges.

## V. CONCLUSION

The evidence at issue in this case was obtained in reasonable reliance on the May 17 Warrant. Even if the May 30 search of Defendant's phone exceeded the scope permitted by the May 17 Warrant, the officer's conduct was not so egregious as to make blanket suppression the appropriate remedy. It thus appears that the evidence at issue may properly be admitted.

## IV. RECOMMENDATION

**FOR THE FOREGOING REASONS**, the undersigned respectfully recommends that Defendant's "Motion To Suppress" (Document No. 64) be **DENIED**.

## V. TIME FOR OBJECTIONS

The parties are hereby advised that pursuant to 28 U.S.C. § 636(b)(1)(C), and Rule 72 of the Federal Rules of Civil Procedure, written objections to the proposed findings of fact, conclusions of law, and recommendation contained herein may be filed within **fourteen (14) days** of service of same. Responses to objections may be filed within fourteen (14) days after service of the objections. Fed.R.Civ.P. 72(b)(2). Failure to file objections to this Memorandum and Recommendation with the District Court constitutes a waiver of the right to *de novo* review by the District Court. Diamond v. Colonial Life, 416 F.3d 310, 315-16 (4th Cir. 2005); United States v. Benton, 523 F.3d 424, 428 (4th Cir. 2008). Moreover, failure to file timely objections will preclude the parties from raising such objections on appeal. Id. "In order 'to preserve for appeal an issue in a magistrate judge's report, a party must object to the finding or recommendation on that issue with sufficient specificity so as reasonably to alert the district court of the true ground for the

25

objection.'" Martin v. Duffy, 858 F.3d 239, 245 (4th Cir. 2017) (quoting United States v. Midgette, 478 F.3d 616, 622 (4th Cir. 2007)).

**IT IS SO RECOMMENDED.**
Signed: August 4, 2025

David C. Keesler
United States Magistrate Judge